# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **LONNIE ALLEN FIELDS, JR.,** | ) | |
| Plaintiff | ) | Civil Action No. 2:20cv00023 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By: PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | | |

*I. Background and Standard of Review*

Plaintiff, Lonnie Allen Fields, Jr., ("Fields"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Fields protectively filed his applications for DIB and SSI on April 19, 2013, alleging disability as of January 1, 2012, based on thyroid cancer; left eye blindness; ankle and back problems; anxiety; and depression. (Record, ("R."), at 221-22, 228-31, 247, 254, 295.) The claims were denied initially and upon reconsideration. (R. at 111-13, 117-19, 122-24, 128-30, 133-37, 139-44, 146-48.) Fields then requested a hearing before an administrative law judge, ("ALJ"). (R. at 149-50.) A hearing was held on January 4, 2016, at which Fields was represented by counsel. (R. at 36-64, 1161-89.)

The ALJ issued an unfavorable decision on January 14, 2016. (R. at 14-29, 952-67.) After the ALJ issued her decision, Fields pursued his administrative appeals, (R. at 317-19, 1013-15), but the Appeals Council denied his request for review. (R. at 1-5, 974-79.) Fields then filed an action in this court seeking review of the ALJ's unfavorable decision. (R. at 981-84.) *See Fields v. Berryhill*, Case No. 2:17cv00005. By order dated April 16, 2018, this court remanded Fields's claims to the ALJ for further review.[2] (R. at 985-1007.)

---

[2] More specifically, this court found that substantial evidence supported the ALJ's finding as to Fields's mental residual functional capacity, but on remand, an ALJ was to reconsider his physical impairments, specifically, his pulmonary impairments and his overall residual functional capacity. (R. at 986-1007.)

By order dated September 12, 2018, the Appeals Council remanded Fields's claims and instructed the ALJ to give further consideration consistent with this court's order. (R. at 1010-11.) The Appeals Council noted Fields filed subsequent claims for disability benefits on February 24, 2017,[3] and rendered it duplicative. (R. at 1010-11.) Therefore, the ALJ was instructed to consolidate Fields's claims, associate the evidence and issue a new decision on the consolidated claims. (R. at 1010.) Upon remand, the ALJ held a supplemental hearing on September 17, 2019, at which Fields, again, was represented by counsel. (R. at 905-48.)

By decision dated October 11, 2019, the ALJ, again, denied Fields's claims. (R. at 873-94.) The ALJ found that Fields met the nondisability insured status requirements of the Act for DIB purposes through September 30, 2017. (R. at 876.) The ALJ found Fields had not engaged in substantial gainful activity since January 1, 2012, the alleged onset date. (R. at 876.) The ALJ determined Fields had severe impairments, namely degenerative disc disease of the lumbar spine; asthma, emphysema and pneumoconiosis; anxiety; depression; borderline intellectual functioning; arthralgia of the right ankle; hepatitis B and C; and obesity, but she found Fields did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 876.) The ALJ found Fields had the residual functional capacity to perform simple, repetitive, unskilled light[4] work, except he could not utilize right foot controls, but could occasionally push/pull with the right lower extremity; he could never crawl; he could occasionally climb ramps and stairs,

---

[3] On his February 24, 2017, claims, Fields alleged disability based on back, knee and ankle problems, breathing problems, anxiety, depression and vision problems. (R. at 1139.)

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2020).

balance, kneel, stoop and crouch; he must avoid even moderate exposure to extreme temperatures, excess humidity and pulmonary irritants; and he must avoid all exposure to hazardous machinery, working at unprotected heights, climbing ladders, ropes or scaffolds and vibrating surfaces. (R. at 880.) The ALJ further found Fields was able to attend, persist and concentrate for two-hour segments with normal breaks as allowed by the employer, but could complete a normal eight-hour workday, 40-hour workweek; he could have occasional interaction with the public and frequent interaction with co-workers and supervisors; he could respond appropriately to supervision, co-workers and usual work situations; and he could frequently use near and far acuity and field of vision with his left eye with no limitations of the right eye. (R. at 880.) The ALJ found Fields was unable to perform his past relevant work. (R. at 892.) Based on Fields's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Fields could perform, including the jobs of a production assembler, a cafeteria attendant and a laundry worker. (R. at 893-94.) Thus, the ALJ concluded that Fields was not under a disability as defined by the Act from January 1, 2012, through the date of the decision, and he was not eligible for SSI and DIB benefits. (R. at 894.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2020).

After the ALJ issued her decision, Fields pursued his administrative appeals, (R. at 1084-86), but the Appeals Council denied his request for review. (R. at 863-68.) Fields then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2020). This case is before this court on Fields's motion for summary judgment filed April 6, 2021, and the Commissioner's motion for summary judgment filed May 6, 2021.

## II.  Facts

Fields was born in 1974, (R. at 221, 228), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Fields has a high school education and was enrolled in special education classes throughout his school years. (R. at 56, 248, 1140.) He has vocational training in auto body repair. (R. at 1140.) He stated that he could read "a little bit." (R. at 931.) Fields has past relevant work experience as a roof bolter in the mining industry. (R. at 56, 58, 248, 913-14.) Fields stated he sustained a head and eye injury in a 2009 motor vehicle accident. (R. at 925.) He stated he wore a knee brace because he had problems with his right leg and knee giving out. (R. at 915, 922, 924.) Fields testified he was unable to work due to back and leg pain and because he "stayed depressed all the time." (R. at 920-22.) Fields stated he used a nebulizer five times a day and spray puffers daily to help him breathe. (R. at 927.) Fields stated he experienced panic attacks "every other day." (R. at 928.)

Barry Hensley, a vocational expert, was present and testified at Fields's 2019 hearing. (R. at 931-45.) Hensley was asked to consider a hypothetical individual of Fields's age, education and work history, who could read at the third-grade level; who could frequently use near and far acuity and field of vision in his left eye; who had the residual functional capacity to perform light work that did not require use of right foot controls or more than occasional pushing and pulling with the right lower extremity; who could perform work that did not require more than occasional climbing of ramps and stairs, balancing, stooping, kneeling and crouching; that did not require crawling, exposure to hazardous machinery or unprotected heights, climbing of ladders, ropes or scaffolds or working on vibrating surfaces; and that did not require even moderate exposure to temperature

extremes, excess humidity and pulmonary irritants. (R. at 936-37.) He stated that such an individual could not perform Fields's past work, but other work existed in significant numbers that such an individual could perform, including jobs as a production assembler, a cafeteria attendant and a laundry worker. (R. at 937.) When asked to consider the same hypothetical individual, but who would be limited to understanding, remembering and carrying out simple instructions in repetitive, unskilled work; who could attend, persist and concentrate for two-hour segments with normal breaks, but could complete a normal eight-hour workday and 40-hour workweek; who could have no more than occasional interactions with the general public and frequent interaction with co-workers and supervisors; and who could respond appropriately to supervision, co-workers and usual work situations, he stated that such an individual could perform the jobs previously identified (R. at 937-38.)

When asked to consider the same hypothetical individual, but who would be limited to standing and walking only two hours in an eight-hour workday, Hensley stated that such an individual could not perform Fields's past work, but that other work existed in significant numbers at the sedentary[5] level, including jobs as an inspector, a bonder and an ampoule sealer. (R. at 938-39.) Hensley stated there would be no jobs available that a hypothetical individual could perform should he be limited as indicated by the December 2015 assessment completed by family nurse practitioner Tauna Gulley. (R. at 856-58, 940-41.) When asked if hypothetical individual number one also would be limited to only occasional

_____

[5] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2020).

reaching in all directions, handling, feeling, pushing and pulling with his right dominant upper extremity, Hensley stated that light work would be eliminated. (R. at 941-42.) However, he stated the sedentary jobs previously identified would not be eliminated, as they could be performed with one hand. (R. at 942.) Hensley was then asked to consider the initial hypothetical individual with the reaching limitations previously identified and who could only occasionally stoop, squat, bend and kneel. (R. at 943.) He stated all work would be precluded. (R. at 943.) He also stated there would be no jobs available should the individual be limited to only occasional use of his bilateral upper extremities or if the individual had marked[6] limitations in his ability to follow work rules, to relate to co-workers; to interact with supervisors, to deal with the public and to function independently. (R. at 943-45.)

In rendering her decision, the ALJ reviewed records from Dr. Andrew Bockner, M.D., a state agency physician; Dr. Joseph Cader, M.D., a state agency physician; St. Charles Breathing Center; Robert S. Spangler, Ed.D., a licensed psychologist; University of Virginia, ("UVA"); Dr. Gurcharan S. Kanwal, M.D.; Mountain View Regional Medical Center, ("Mountain View"); Norton Community Hospital; Indian Path Medical Center, ("Indian Path"); The Health Wagon; Lonesome Pine Hospital; Wellmont Medical Associates; and Frontier Health.

As noted above, this court remanded Fields's claims for further consideration of his pulmonary impairments and the effect such impairments have on his ability to perform work. (R. at 985-1007.) In addition, this court found substantial evidence to support the mental residual functional capacity findings from the prior decision and discounted the opinions of Spangler and Gulley. (R. at

---

[6] Marked was defined as activity that could be performed less than occasionally and which resulted in an unsatisfactory work performance. (R. at 945.)

828-30, 860-62, 985-1007.) Based on this, the undersigned will not include all the medical evidence discussed in this court's March 2018 report and recommendation, but will include only the evidence Fields contends is at issue along with any new evidence presented.

On April 16, 2014, Dr. Josephine Cader, M.D., a state agency physician, found that Fields had the residual functional capacity to perform medium[7] work. (R. at 90-92.) Dr. Cader found that Fields could frequently climb ramps and stairs, balance, stoop, kneel and crouch; and occasionally climb ladders, ropes or scaffolds and crawl. (R. at 91.) No manipulative, visual or communicative limitations were noted. (R. at 91.) She opined that Fields should avoid concentrated exposure to hazards, such as machinery and heights. (R. at 92.)

On July 10, 2015, Fields saw Gulley, a family nurse practitioner with The Health Wagon, for complaints of knee and back pain. (R. at 684-85.) Upon examination, Fields's lungs were clear; he had diminished vision in his left eye; he had paraspinal muscle spasm; tenderness to palpation over the lumbar-sacral spine; he made good eye contact; his speech was clear; and he was neurologically intact. (R. at 684.) On August 6, 2015, Gulley reported Fields's lungs were clear; he had paraspinal muscle spasm; tenderness to palpation over the lumbar-sacral spine; he had full range of motion; and he had a normal gait. (R. at 682.) A chest x-ray showed five lobe simple coal worker's pneumoconiosis with an element of emphysema. (R. at 762.) Fields was advised to stop smoking. (R. at 762.) On August 18, 2015, pulmonary function tests showed moderate obstruction. (R. at 672.) Fields's lung age was assessed at 99. (R. at 672.) Fields's forced expiration

---

[7] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2020).

volume one second, ("FEV$_1$"), was 2.16 percent, 50 percent of the predicted FEV$_1$. (R. at 672.) The FEV$_1$ and forced vital capacity, ("FVC"), was 57 percent, 73 percent of the predicted FEV$_1$/FVC. (R. at 672.) On August 31, 2015, chest x-rays showed emphysema. (R. at 676.) On September 14, 2015, Fields was seen at St. Charles Breathing Center for a black lung evaluation. (R. at 800-03.) Chest x-rays showed stage 1/1 pneumoconiois. (R. at 798, 804.)

On November 7, 2015, Robert S. Spangler, Ed.D., a licensed clinical psychologist, evaluated Fields at the request of Fields's attorney. (R. at 819-26.) Spangler diagnosed depressive disorder, moderate to severe; generalized anxiety disorder, severe; debilitating stress level, moderate to severe; borderline intelligence; functional illiteracy; poor math skills; visual perceptual disorder, severe with organicity; slow pace, no longer competitive; long-term memory impairment, moderate; alcohol use disorder, full remission; and tobacco use disorder, mild. (R. at 825.)

On November 12, 2015, Spangler completed a mental assessment, indicating Fields had a satisfactory ability to maintain attention and concentration. (R. at 828-30.) He found Fields had a seriously limited ability to follow work rules; to relate to co-workers; to use judgment in public; to interact with supervisors; to function independently; to understand, remember and carry out simple job instructions; and to maintain personal appearance. (R. at 828-29.) Spangler opined Fields had no useful ability to deal with the public; to deal with work stresses; to understand, remember and carry out complex and detailed job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 828-29.) He found Fields would be absent from work more than four days per month. (R. at 830.)

On December 18, 2015, Gulley completed a medical assessment, indicating Fields could occasionally lift and carry items weighing 10 pounds and frequently lift and carry items weighing five pounds; stand and/or walk for a total of two hours in an eight-hour workday and do so for 30 minutes without interruption; sit for two hours in an eight-hour workday and do so for 30 minutes without interruption; occasionally stoop and kneel; and never climb, balance, crouch or crawl. (R. at 856-58.) Gulley found Fields's abilities to reach; to handle; to feel; to push/pull; to see; to hear; and to speak were affected by his impairments. (R. at 857.) She found Fields would be restricted from working around heights; moving machinery; temperature extremes; chemicals; dust; noise; fumes; humidity; and vibration. (R. at 858.) She opined Fields would be absent from work more than two days a month. (R. at 858.)

That same day, Gulley completed a mental assessment, indicating Fields had a seriously limited to no useful ability to perform all occupational, performance and personal/social adjustments. (R. at 860-62.) She opined Fields would be absent from work more than two days a month. (R. at 862.)

Beginning in November 2015 through May 2016, Fields participated in the Virginia Alcohol and Safety Program, ("VASAP"),[8] at Frontier Health, as a result of a driving under the influence charge. (R. at 1571-98.) Session notes indicate Fields was appropriately dressed and groomed; he demonstrated logical cognitions; he was attentive; he made good eye contact; his speech was clear and logical; and he was active in group discussions. (R. at 1571, 1573-75, 1577-82, 1587-88, 1590-94, 1596.) In addition to participating in the VASAP program, Fields was assessed at Indian Path in November 2015 for "nerve problems," depression and anxiety.

_____

[8] Fields also participated in the VASAP program in 2008. (R. at 1600-26.)

(R. at 1518-33, 1553-54.) Fields reported his activities included hunting, fishing, riding horses and all-terrain vehicles and attending football games. (R. at 1530.) Fields was diagnosed with opioid use disorder, severe, in sustained remission; unspecified amphetamine or other stimulant-related disorder, in sustained remission; cannabis use disorder, severe, in sustained remission; and alcohol use disorder, severe, in sustained remission. (R. at 1544.)

On December 18, 2015, Fields was seen by Gulley for complaints of breathing problems and depression. (R. at 1292-94.) Fields's lungs were clear to auscultation, bilaterally, with good air movement and no wheezes, rales or rhonchi; he had tenderness to palpation over the lumbar-sacral spine; his right ankle had limited range of motion; his gait was normal; he made good eye contact; he was cooperative; and he had clear speech. (R. at 1292.) Gulley diagnosed chronic obstructive asthma with status asthmaticus, unspecified; hyperlipidemia; and degeneration of intervertebral disc, site unspecified. (R. at 1292.) In February 2016, Fields's lungs were clear to auscultation, bilaterally; his extremities had no clubbing, cyanosis or edema; he had normal motor strength in his upper and lower extremities; and he had normal sensation. (R. at 1288.)

In May 2016, notes from Indian Path show Fields was diagnosed with unspecified depressive disorder; unspecified anxiety disorder; and tobacco abuse disorder, mild, but stated Fields was not interested in receiving mental health services. (R. at 1539, 1545.)

On May 4, 2016, Fields was seen at UVA for complaints of shortness of breath. (R. at 1355-59.) Upon examination, Fields's lungs had normal breath sounds with no rales; his musculoskeletal examination displayed normal range of

motion and no edema; and his mood and affect were normal. (R. at 1356.) Pulmonary function tests showed mild obstructive lung disease with air trapping. (R. at 1357.) A six-minute walk test showed near normal exercise tolerance with no oxygen desaturation. (R. at 1357.) Fields was diagnosed with mild obstructive lung disease with air trapping; right middle lobe pulmonary nodule; and tobacco abuse, active. (R. at 1358.)

On July 19, 2016, Fields established care with Dr. Bryan L. Watson, D.O., a physician with Wellmont Medical Associates. (R. at 1253-58.) Fields reported back pain that radiated into his right lower leg. (R. at 1253.) His examination was normal except for tenderness, pain and spasm in the lumbar back and 4/5 muscle strength in the right leg. (R. at 1255-56.) Dr. Watson diagnosed lumbar degenerative disc disease; chronic hepatitis C without hepatic coma; history of thyroid cancer; and coal worker's pneumoconiosis. (R. at 1256.)

On August 29, 2016, Fields was seen at UVA and reported his breathing was a "bit better." (R. at 1360.) He reported using albuterol three times a day and sometimes up to five or six times a day. (R. at 1360.) Fields displayed no signs of respiratory distress; he had decreased air movement, but otherwise, his lungs were clear to auscultation, bilaterally; he had no wheezing, rhonchi or crackles; he had normal muscle bulk and tone; his extremities were normal, atraumatic and without cyanosis or edema; and his mood and affect were normal. (R. at 1361.) Pulmonary function testing showed Fields's $FEV_1$ was 3.53 percent, 82 percent of the predicted $FEV_1$. (R. at 1354.) His $FEV_1/FVC$ was 72 percent, 91 percent of the predicted $FEV_1/FVC$. (R. at 1354.) These findings indicated improvement, as Fields had a normal spirometry with no significant post bronchodilator response and variable extrathoracic obstruction. (R. at 1354, 1363, 1365.) A CT scan of

Fields's chest redemonstrated multiple centrilobular nodular ground-glass opacities with interval enlargement of multiple bilateral subpleural and peribronchovascular pulmonary nodules within the right middle lobe. (R. at 1362.) Fields was diagnosed with mildly persistent asthma, not well-controlled; tobacco abuse; and multiple pulmonary nodules. (R. at 1363.)

On September 1, 2016, Fields saw Dr. Watson for complaints of chest pain that radiated into his left side, back pain and exertional chest pressure. (R. at 1259-64.) His examination was normal except for tenderness, pain and spasm in the lumbar back and 4/5 strength in the right leg. (R. at 1261-62.) Dr. Watson added chest pain to Fields's diagnoses. (R. at 1262.) On September 5, 2016, chest x-rays showed no acute cardiopulmonary abnormality. (R. at 1221.) On October 20, 2016, Fields saw Dr. Watson for complaints of lumbar spine pain that radiated to both legs and numbness in both legs. (R. at 1266-71.) Fields denied depression and anxiety. (R. at 1268.) Examination was normal, except Fields had tenderness, pain and spasm in the lumbar back and 4/5 strength in the right leg. (R. at 1268-69.) A urine drug screen was positive for marijuana. (R. at 1270.)

The record shows Fields presented to the emergency department on four occasions in 2017 for complaints of abdominal pain and back pain. (R. at 1302-12, 1314-22, 1385-94, 1405-17.) During his examinations, Fields's lumbar back had tenderness, pain and spasm, but normal range of motion. (R. at 1306.) X-rays of Fields's lumbar spine showed decreased L5-S1 disc space with degenerative changes and mild spondylosis of the L5 vertebra. (R. at 1411, 1414-15.) A CT scan of Fields's abdomen and pelvis showed nonobstructive bilateral renal calculi and mild distal esophageal circumferential wall thickening, likely reflux esophagitis. (R. at 1393.) He was diagnosed with degenerative disc disease of the lumbar spine;

lumbar paraspinal muscle spasm; back pain; and lumbar strain. (R. at 1302, 1321, 1411.)

On February 27, 2017, Fields was seen at UVA and reported he had been doing okay overall, and his breathing was "somewhat improved." (R. at 1366.) A CT scan of Fields's chest was unchanged. (R. at 1368.) It was noted the CT scan findings were suggestive of coal worker's pneumoconiosis and respiratory bronchiolitis. (R. at 1368.)

On April 10, 2017, Fields established care with Dr. Gurcharan S. Kanwal, M.D. (R. at 1399-1401.) Dr. Kanwal diagnosed chronic low back pain; bilateral knee pain; and history of cancer of the thyroid gland, in remission. (R. at 1401.) A urine drug screen was positive for marijuana. (R. at 1403.)

On February 12, 2018, Fields reported to Dr. Watson that he had not taken his Synthroid medication in two weeks. (R. at 1628.) He reported numbness in both legs and denied depression and anxiety. (R. at 1628, 1630.) Examination was normal, except Fields had tenderness, pain and spasm in the lumbar back, and he had 4/5 muscle strength in the right leg. (R. at 1630-31.)

In 2018, Fields presented to the emergency department on six occasions for complaints of esophageal dysphagia, abdominal pain, rib pain, right upper quadrant pain, shortness of breath and back pain. (R. at 1418-37, 1442-88, 1712-22.) Ultrasounds of Fields's gallbladder showed gallstones. (R. at 1464, 1476.) X-rays of Fields's chest were questionable for very subtle alveolar opacities at the bilateral mid to lower lung zones versus normal pulmonary parenchymal opacities. (R. at 1473.) A CT scan of Fields's abdomen and pelvis showed bilateral non-obstructing

kidney stones. (R. at 1714.) He was diagnosed with esophageal dysphagia; gallstones; right upper abdominal pain; urolithiasis with mild hydronephrosis; complicated urinary tract infection; and back muscle strain. (R. at 1418, 1422, 1442, 1468, 1483, 1722.)

In May and June 2018, Fields saw Dr. Watson for complaints of right upper quadrant pain. (R. at 1633-39, 1641-42.) Fields stated he was exposed to marijuana because his wife smoked it in the house. (R. at 1635.) He denied depression and anxiety. (R. at 1636.) Dr. Watson's examination findings remained unchanged. (R. at 1636-37.) Dr. Watson suggested Fields arrange a cholecystectomy. (R. at 1642.)

On December 14, 2018, Fields complained of panic attacks and back and arm pain. (R. at 1672-93.) He reported he did not like going out of the house and did not want to talk to people. (R. at 1672.) Fields also reported difficulty sitting or lying for long periods due to back pain. (R. at 1673.) Upon examination, Fields had low back tenderness and lumbar back bone tenderness and pain. (R. at 1675.) Christy R. Swinney, N.P., a nurse practitioner with Wellmont Medical Associates, diagnosed hypercholesterolemia; history of thyroid cancer; gastroesophageal reflux disease, "(GERD"), with esophagitis; asthma, unspecified; elbow tendonitis; lumbar degenerative disc disease; anxiety; and depression. (R. at 1676-78.) That same day, Fields presented to the emergency department at Norton Community Hospital for complaints of left arm pain and numbness. (R. at 1704-11.) Chest x-rays showed no evidence of acute cardiopulmonary disease. (R. at 1705.) X-rays of Fields's left humerus and left elbow were normal. (R. at 1707, 1709.) Fields was diagnosed with neuropathy. (R. at 1711.)

On January 28, 2019, Fields complained of anxiety, bilateral elbow pain, bilateral knee pain and insomnia. (R. at 1663-70.) Fields had low back tenderness and lumbar back bone tenderness and pain, as well as bilateral arm tenderness and pain/soreness. (R. at 1666-67.) Swinney diagnosed anxiety; arthralgia, unspecified joint; upper abdominal pain; and insomnia, unspecified. (R. at 1667-68.) On March 20, 2019, Fields complained of anxiety, back pain, bilateral knee and hand pain and insomnia. (R. at 1650-62.) Fields stated his anxiety improved with medication. (R. at 1653.) His examination was normal, except he exhibited low back tenderness; he had bony tenderness and medial and lateral joint line tenderness in the right knee; bilateral arm tenderness and pain/soreness; and bilateral hand tenderness. (R. at 1654-55.)

Fields was seen at UVA from March through May 2019 for complaints of asthma; dyspnea on exertion; environmental allergies; shortness of breath; chest pain; anxiety; and panic attacks. (R. at 1724-87.) On March 1, 2019, a pulmonary function test was normal. (R. at 1732, 1759-64.) On April 26, 2019, Fields endorsed dyspnea on exertion with walking from the examination room to the waiting room, and he needed to stop along the way. (R. at 1731.) Fields reported shortness of breath associated with wheezing and occasional dizziness and left-sided chest pain with walking or bending. (R. at 1731.) On May 13, 2019, Fields admitted to using marijuana "every now and then" and rare consumption of alcohol. (R. at 1727.)

On August 27, 2019, Fields saw Swinney for complaints of worsening bilateral neck pain that radiated into his hands causing numbness; back pain that radiated into his right hip and leg causing foot pain; and depression. (R. at 1790-1805.) Fields reported his anxiety improved with medication. (R. at 1793.) Upon

examination, Fields had low back tenderness; his right knee exhibited bony tenderness and medial and lateral joint line tenderness; his lumbar back exhibited decreased range of motion, tenderness and pain; he had tenderness and pain/soreness in both arms; he had a small area of tenderness on the bottom of the right foot; and he had some tenderness in both hands. (R. at 1794-95.) Fields was diagnosed with anxiety; lumbar degenerative disc disease; chronic hepatitis C without hepatic coma; history of thyroid cancer; mixed hyperlipidemia; asthma, unspecified; COPD; neck pain; bilateral hand numbness; right foot pain; and insomnia. (R. at 1790.)

That same day, Fields presented to the emergency department at Mountain View for complaints of right hip pain that radiated into his right leg. (R. at 1810-17.) He had decreased range of motion, tenderness and pain in his lumbar back; his straight leg raising tests were negative; he had hypesthesia in the right lower extremity; and he exhibited no sensory loss. (R. at 1812.) X-rays of Fields's lumbar spine showed degenerative disc disease at the L5-S1 level with vacuum phenomenon; subchondral sclerosis, anterior and posterior vertebral osteophytes; mild degenerative narrowing at the L4-L5 disc space; facet arthrosis at the L4-L5 and L5-S1 levels; evidence of bony foraminal/lateral recess encroachment at the L5-S1 level; and decreased bone density. (R. at 1814-15.) X-rays of Fields's right foot showed a fracture involving the proximal phalanx of the great toe. (R. at 1816.)

### III.  Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2020). *See also Heckler v. Campbell*,

461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Fields argues that the ALJ's decision is not supported by substantial evidence. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) Fields argues that the ALJ erred by failing to give greater weight to the opinions of Spangler and Gulley, and by giving more weight to the opinions of the state agency psychologists. (Plaintiff's Brief at 6-7.) He contends the state agency psychologists' assessments were rendered in April 2014; thus, making them "stale and outdated." (Plaintiff's Brief at 7.)

Fields argues that the ALJ erred by failing to give greater weight to the opinions of Spangler and Gulley, and by giving more weight to the opinions of the state agency psychologists. (Plaintiff's Brief at 6-7.) This court previously found that the ALJ sufficiently weighed the medical evidence concerning Fields's mental residual functional capacity, particularly the assessments provided by Spangler and Gulley. (R. at 1003, 1006.) Although the new evidence of record indicates Fields was diagnosed with unspecified depressive disorder and unspecified anxiety disorder, (R. at 1545), notes show he was appropriately dressed and groomed; he demonstrated logical cognition; he was attentive; his mood and affect were normal; he made good eye contact; he was cooperative; and he had clear and logical speech. (R. at 1292, 1356, 1361, 1571, 1573-75, 1577-82, 1587-88, 1590-95.) In May 2016, Fields stated he was not interested in receiving mental health services. (R. at 1539.) In October 2016 and May 2018, Fields denied depression and anxiety symptoms. (R. at 1268, 1636.) In fact, in March and August 2019, Fields stated his anxiety improved with medication. (R. at 1653, 1793.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

The ALJ considered Fields's reports and the fact he was prescribed medications, and found his depression and anxiety were severe impairments. (R. at 876, 48-80, 892.) Thus, the ALJ found Fields had the mental residual functional capacity to attend, persist and concentrate for two-hour segments with normal breaks as allowed by the employer, and he could complete a normal eight-hour workday, 40-hour workweek; he could have occasional interaction with the public and frequent interaction with co-workers and supervisors; and he could respond appropriately to supervision, co-workers and usual work situations. (R. at 880.) Based on this, I find the ALJ sufficiently weighed the medical evidence regarding

Fields's mental residual functional capacity. Therefore, I will not address Fields's argument that the state agency psychologists' assessments were "stale and outdated."

As noted above, Fields's claims were remanded by this court for further consideration of his pulmonary impairments and the effect such impairments would have on his work-related abilities. (R. at 1004-06.) A pulmonary function test in May 2016 showed mild obstructive lung disease with air trapping. (R. at 1357.) A six-minute walk test showed near normal exercise tolerance with no oxygen desaturation. (R. at 1357.) Fields was diagnosed with mild obstructive lung disease with air trapping; right middle lobe pulmonary nodule; and tobacco abuse, active. (R. at 1358.) Pulmonary function tests in August 2016 were improved, and he displayed no signs of respiratory distress; he had decreased air movement, but, otherwise, his lungs were clear to auscultation, bilaterally; and he had no wheezing, rhonchi or crackles. (R. at 1361.) Fields was diagnosed with mild, persistent asthma, not well-controlled; tobacco abuse; and multiple pulmonary nodules. (R. at 1363.) In March 2019, a pulmonary function test was normal. (R. at 1732, 1759-64.) However, in April 2019, Fields endorsed dyspnea on exertion with walking from the examination room to the waiting room; yet, upon examination, his pulmonary examination showed normal effort, and breath sounds were clear bilaterally. (R. at 1731, 1733.)

The ALJ found Gulley's medical assessment, indicating Fields was not capable of even sedentary work, to be "weak and inconsistent" with the objective medical findings. (R. at 856-58, 891.) The ALJ noted Fields's subjective complaints were out of proportion with the objective medical findings. (R. at 891.) The ALJ noted the medical evidence did not support consistent multi-joint

inflammation; reduced grip strength in the hands; muscle atrophy; difficulty initiating movement or moving generally; or muscle tremors. (R. at 891.) While Fields was diagnosed with elbow tendonitis in December 2018, (R. at 1672), x-rays of his left elbow were normal. (R. at 1709.) Other than Gulley, none of Fields's medical care providers placed any work-related restrictions on his ability to use his upper extremities. As noted by the ALJ, the record shows some reduced range of motion of the lumbar spine and right ankle, and Fields exhibited pain and spasms in the lumbar spine with mildly reduced motor strength of the right leg. (R. at 891, 1654-55, 1666-67, 1675, 1794, 1812.) Based on this, the ALJ found the record failed to support Gulley's assessment. (R. at 891.) In addition, the ALJ gave "less weight" to the state agency physicians who opined Fields could perform a reduced range of medium work based on her more restrictive residual functional capacity finding. (R. at 71, 90-92, 891-92.)

On remand, the ALJ identified Fields's asthma, emphysema, pneumoconiosis, degenerative disc disease of the lumbar spine and arthralgia of the right ankle as severe impairments and found he had the residual functional capacity to perform simple, repetitive, unskilled light work, except he could not utilize right foot controls, but could occasionally push/pull with the right lower extremity; he could never crawl; he could occasionally climb ramps and stairs, balance, kneel, stoop and crouch; he must avoid moderate exposure to extreme temperatures, excess humidity and pulmonary irritants; and he must avoid all exposure to hazardous machinery, working at unprotected heights, climbing ladders, ropes or scaffolds and working on vibrating surfaces. (R. at 880.) Based on this, I find substantial evidence exists to support the ALJ's weighing of the medical evidence and her finding as to Fields's residual functional capacity. Thus, I find

substantial evidence exists to support the ALJ's finding that Fields was not disabled.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.   Substantial evidence exists in the record to support the ALJ's weighing of the medical evidence;

2.   Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3.   Substantial evidence exists in the record to support the Commissioner's finding that Fields was not disabled under the Act and was not entitled to DIB and SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Fields's motion for summary judgment and grant the Commissioner's motion for summary judgment.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as

provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     August 27, 2021.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE